UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

C.J. SEGERSTROM AND SONS,

                   Plaintiff,

     v.

LEXINGTON INSURANCE COMPANY, et al.,

                 Defendants.

Case No.:  8:22-cv-00466-MEMF-JDEx

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS [ECF NO. 22]**

     Before the Court is the Motion to Dismiss filed by Defendant Lexington Insurance Company. ECF No. 22. For the reasons stated herein, the Court hereby DENIES the Motion to Dismiss.

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.   Background**

**A.  Factual Background[1]**

Plaintiff C.J. Segerstrom & Sons ("Segerstrom") owns and operates South Coast Plaza, a shopping mall located in Costa Mesa, California, and the largest shopping center on the West Coast. Compl. ¶ 1. Segerstrom purchased broad commercial property insurance from a number of insurers, including Defendants Lexington Insurance Company ("Lexington") and Starr Surplus Lines Insurance Company ("Starr") (collectively, "Insurer Defendants"). *Id.* ¶ 2. On March 17, 2020, Segerstrom was forced to close South Coast Plaza due to the outbreak of COVID-19 in Orange County and in order to comply with related closure and stay-at-home orders issued by state and county governmental authorities. *Id.* ¶ 3. South Coast Plaza was unable to reopen for several months, resulting in substantial financial losses to Segerstrom totaling in excess of $5,000,000. *Id.* However, the Insurer Defendants have declined to insure Segerstrom for its losses as a result of the closure of South Coast Plaza in response to the COVID-19 outbreak. *Id.* ¶ 5.

i.  Special Time Element – Cancellation Coverage

The Insurer Defendants participate in a commercial property insurance program consisting of several insurance policies purchased by Segerstrom for the June 1, 2019, to June 1, 2020, policy period. *Id.* ¶ 14. Each insurer participating in the insurance program is responsible for a share of Segerstrom's overall limits of coverage. *Id.* Among other coverages, the policies provide up to $5,000,000 in "Special Time Element – Cancellation Coverage." *Id.*

The Special Time Element – Cancellation Coverage states, in relevant part:

Notwithstanding that Time Element loss insured under this Policy must be caused by or result from *loss, damage or destruction* not otherwise excluded, *this Policy is extended to insure the actual loss sustained by the Insured resulting from* the cancellation of, and/or inability to accept bookings or reservations for accommodation, receive admissions, and/or *interference with the business at any insured location all as a direct result of the "Occurrence" of:*

1)  murder, suicide, rape or other violent crime;

---

[1] Unless otherwise indicated, the following factual background is derived from the Complaint. Complaint, ECF No. 1 ("Compl.").

**2) contagious or infectious disease (including decontamination and clean-up costs);**

3) food or drink poisoning;

**4) any of the following that occur within a radius of ten (10) miles of an insured location, to the extent such Time Element loss is not otherwise insured elsewhere in this policy;**

    **a. outbreak of a contagious and/or infectious disease**

    b. outbreak of riot or civil commotion

    c. occurrence of fire, or explosion, or windstorm, or "Flood", or "Earthquake"

    d. closure of a seaport or airport.

5) **closing of the whole or part of the premises of the Insured either by the Insured or by order of a Public Authority consequent upon the existence or threat of hazardous conditions** either actual or suspected at an insured location;

ECF No. 1-1 ("Lexington Policy") at 17–18 (emphasis added).

      ii.  The Pollution and Contamination Exclusion

Lexington issued the Lexington Policy for the June 1, 2019, to June 1, 2020, policy period. *Id.* ¶ 15; *see generally* Lexington Policy. The Lexington Policy covers 40% of Segerstrom's property insurance program limits for the 2019–2020 policy period, including 40% of Segerstrom's overall $5,000,000 limit per occurrence for "Special Time Element – Cancellation Coverage." Compl. ¶ 15. The Lexington Policy contains a number of endorsements. *See generally* Lexington Policy at 42–70.

Endorsement #010 is titled "Pollution, Contamination, Debris Removal Exclusion Endorsement." *Id.* at 53–54 ("Endorsement #010"). The Pollution and Contamination Exclusion in Endorsement #010 reads, in relevant part:

**2. Pollution and Contamination Exclusion**

**This Policy does not cover loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS**, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this Policy.

. . .

3

**CONTAMINANTS or POLLUTANTS means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder**, including, but not limited to, bacteria, **virus,** or hazardous substances as listed in the Federal Water, Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U. S. Environmental Protection Agency. Waste includes materials to be recycled, reconditioned or reclaimed.

Endorsement #010 at 53 (emphasis added).

### iii.   The COVID-19 Pandemic

In December 2019, the SARS-CoV-2 virus, which causes the illness known as COVID-19, began its spread throughout the world, prompting the World Health Organization to declare a global pandemic. Compl. ¶ 21. According to the World Health Organization, the virus spreads through (1) short- and long-range airborne transmission, (2) droplet transmission, or (3) when touching one's eyes, nose, or mouth after touching surfaces or objects have been contaminated by the virus. *Id.* ¶ 22. Additionally, poor ventilation, indoor locations, crowded areas, and close proximity for extended periods of time increase the chances of transmission of the COVID-19 virus. *Id.* ¶ 23.

In response to the SARS-CoV-2 outbreak, governmental authorities across the United States issued "stay at home" and "shelter in place" orders, requiring suspension of non-essential businesses. On March 12, 2020, California Governor Gavin Newson issued Executive Order N-25-20, stating: "All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19." *Id.* ¶ 25. On March 17, 2020, Orange County issued an emergency order banning non-essential gatherings. *Id.* ¶ 26. Two days later, the State of California issued a stay-at-home order requiring all individuals living in the state to remain within their residence, "except as needed to maintain operations of the federal critical infrastructure sectors." *Id.* ¶ 27.

### B. Procedural History

On March 29, 2022, Segerstrom brought this action against the Insurer Defendants, alleging: (1) breach of contract against both; (2) tortious breach of the implied covenant of good faith and fair dealing against both; and (3) declaratory relief only against Lexington. *See generally* Compl. On

June 14, 2022, Lexington filed the instant Motion to Dismiss. ECF No. 22 ("Mot." or "Motion"). On July 29, 2022, the Motion was fully briefed. ECF Nos. 28 ("Opposition" or "Opp'n"), 32 ( "Reply"). The Court held oral argument on this matter on October 6, 2022. On October 11, 2022, Lexington filed a Notice of Supplemental Authority in support of its Motion. ECF No. 42. On January 23, 2023, Segerstrom filed a Notice of Supplemental Authority in support of its Opposition to the Motion. ECF No. 48.

## II.   **Applicable Law**

### A.  Motions to Dismiss for Failure to State a Claim

Under Federal Rule of Civil Procedure Rule 12(b)(6), a party may file a motion to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The purpose of Rule 12(b)(6) is to "enable defendants to challenge the legal sufficiency of claims asserted in a complaint." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). A district court may properly dismiss a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts to support a cognizable legal theory. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than "threadbare recitals of the elements of a cause of action." *Id.* "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159; *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We

1    accept factual allegations in the complaint as true and construe the pleadings in the light most

2    favorable to the nonmoving party."). This tenet, however, is "inapplicable to legal conclusions."

3    *Iqbal*, 556 U.S. at 678.

4         A district court should generally grant leave to amend freely. *Cervantes v. Countrywide*

5    *Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). However, "a district court may dismiss

6    without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies

7    and amendment would be futile." *Id.* at 1041.

8         **B.  Interpretation of Insurance Policies**

9         Under California law, the "interpretation of an insurance policy is a question of law" for the

10   Court and follows the general rules of contract interpretation. *Waller v. Truck Ins. Exch., Inc.*, 900

11   P.2d 619, 624 (Cal. 1995). These rules require the Court to "look first to the language of the contract

12   in order to ascertain its meaning or the meaning a layperson would ordinarily attach to it." *Id.* at 627.

13   The "goal in construing insurance contracts, as with contracts generally, is to give effect to the

14   parties' mutual intentions." *Minkler v. Safeco Ins. Co. of Am.*, 232 P.3d 612, 616 (Cal. 2010); *see*

15   *also* CAL. CIV. CODE § 1636 (noting that under statutory rules of contract interpretation, the mutual

16   intention of parties at time contract is formed governs interpretation). Such an intent is to be inferred

17   solely from the written provisions of the contract. CAL. CIV. CODE § 1638 ("The language of a

18   contract is to govern its interpretation, if the language is clear and explicit, and does not involve an

19   absurdity."). "If contractual language is clear and explicit, it governs." *Bank of the W. v. Superior*

20   *Ct.*, 833 P.2d 545, 552 (Cal. 1992);  *see also* CAL. CIV. CODE § 1644 (noting that the clear and

21   explicit meaning of a contract's provisions, interpreted in their "ordinary and popular sense,"

22   controls judicial interpretation).

23        However, a policy provision will be considered ambiguous when it is capable of two or more

24   constructions, both of which are reasonable. *Waller*, 900 P.2d at 627. Ambiguity may result from

25   contradictory or necessarily inconsistent language in different portions of the policy. *Delgado v.*

26   *Heritage Life Ins. Co.*, 203 Cal. Rptr. 672, 677 (Ct. App. 1984) (citing 13 Appleman, Insurance Law

27   and Practice § 7386 (rev. ed. 1976)). Furthermore, California courts counsel that the meaning of a

28   word or phrase cannot be considered in isolation. *Ayres v. Prudential Ins. Co. of America*, 602 F.2d

1309, 1311 (9th Cir. 1979). ("Ambiguity is not necessarily to be found in the fact that a word or phrase isolated from its context is susceptible of more than one meaning."). Rather, "[a]n insurance policy must be interpreted as a whole and in context." *Fire Ins. Exch. v. Superior Court*, 10 Cal. Rptr. 3d 617, 624 (Ct. App. 2004). "The whole of a contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other." CAL. CIV. CODE § 1641.

If the terms are ambiguous or uncertain, they must be interpreted "to protect the objectively reasonable expectations of the insured." *Minkler*, 232 P.3d at 616 (internal quotations omitted). If ambiguities in policy language cannot be resolved in accordance with the insured's "objectively reasonable expectations," however, Courts generally resolve ambiguities in insurance contracts against the insurer and in favor of coverage. *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 888–89 (Cal. 1995) (quoting *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1264 (Cal. 1990)). Ambiguities or uncertainties in the policy are to be construed against the insurer in order to achieve the object of coverage for the losses to which the policy relates. *Prickett v. Royal Ins. Co.*, 363 P.2d 907, 909 (Cal. 1961). Under such circumstances, in order to prevail, the insurer must establish that its interpretation of the policy is the only reasonable one. *Palp, Inc. v. Williamsburg Nat'l Ins. Co.*, 132 Cal. Rptr. 3d 592, 599 (Ct. App. 2011). At the outset, the insured maintains the burden of establishing that a claim is within basic coverage. *Prickett*, 363 P.2d at 909. The burden then shifts to the insurer to establish that a specific exclusion applies. *Id.* To be enforceable, any provision or endorsement that takes away or limits coverage reasonably expected by an insured must be "conspicuous, plain and clear." *Haynes v. Farmers Ins. Exch.*, 89 P.3d 381, 385 (Cal. 2004) (quoting *Steven v. Fidelity & Cas. Co.*, 377 P.2d 284, 294 (Cal. 1962)).

## III. <u>Discussion</u>

Lexington contends that: (1) Segerstrom's breach of contract claim fails because the Pollution and Contamination Exclusion precludes coverage of Segerstrom's losses related to the COVID-19 outbreak; and (2) Segerstrom's declaratory and bad faith claims therefore fail as a matter of law. Mot. at 12–15. Segerstrom contends that the Pollution and Contamination Exclusion is inapplicable to its claim and therefore *does not* preclude its claim. Therefore, its declaratory and bad faith claims should survive. Opp'n at 12–19.

7

As discussed below, this Court finds that both readings of the Exclusion are reasonable, thereby rendering the provision ambiguous and requiring that it be construed in favor of Segerstrom and against Lexington.

**A. Segerstrom's breach of contract claim survives because the Pollution and Contamination Exclusion must be construed in favor of Segerstrom, and—when so read—does not preclude coverage of Segerstrom's losses.**

The standard elements for a breach of contract claim are: (1) a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damage to the plaintiff as a result of the breach. *Wall St. Network, Ltd. v. N.Y. Times Co.*, 80 Cal. Rptr. 3d 6, 12 (Ct. App. 2008). Here, the parties do not appear to contest elements 1, 2, and 4—the existence of a valid contract,[2] that Segerstrom failed to perform or was excused for nonperformance, or that Segerstrom suffered damages. The parties further do not appear to contest that the plain language of the policy, specifically the Special Time Element, expressly provides coverage for business interruptions. The only dispute at this stage is over the meaning of the Pollution and Contamination Exclusion.

> i. Lexington's reading of the Pollution and Contamination Exclusion is reasonable.

Any interpretation of an insurance policy—like any other contract—begins with its plain language. Pursuant to CAL. CIV. CODE § 1638, "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." CAL. CIV. CODE § 1638. Similarly, pursuant to CAL. CIV. CODE § 1644:

> The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

*Id.* § 1644.

---

[2] Neither party appears to dispute that the Pollution and Contamination Exclusion is a valid endorsement or that it modifies the Special Time Element Coverage. Although Segerstrom asserts in its Complaint that the Exclusion is "inapplicable," Compl. ¶ 6, the Court does not read this allegation to mean that Segerstrom contends that the Exclusion does not modify the Special Time Element Coverage. Rather, Segerstrom appears to be arguing that the Exclusion does not apply to its claims for losses as a result of COVID-19.

As discussed below, this Court finds that the plain meaning of virus would ordinarily include the SARS-CoV-2 virus. The Pollution and Contamination Exclusion explicitly states that it does not cover loss or damage caused by "actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS." Endorsement #010 at 53. "Contaminants or Pollutants" was defined in the Exclusion as:

> **any solid, liquid, gaseous or thermal irritant or contaminant, . . . which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder**, including, but not limited to, bacteria, **virus,** or hazardous substances as listed in the Federal Water, Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U. S. Environmental Protection Agency.

*Id.* (emphasis added).

As a result, it is reasonable to read the Pollution and Contamination Exclusion to preclude loss caused by a virus that has been "release[d], discharge[d], escape[d] or dispers[ed]," causing or threatening damage or human health and welfare. *Id.* The Court finds that it is reasonable to conclude that the SARS-CoV-2 virus and resulting COVID-19 pandemic falls within the Lexington Policy's Pollution and Contamination Exclusion. Segerstrom cannot reasonably claim—nor does it—that SARS-CoV-2 is not a virus. In fact, its own Complaint supports the conclusion that the SARS-CoV-2 virus is one which has been released, dispersed, and discharged into the atmosphere, resulting in infections and transmissions, and therefore damage to human health and welfare.[3]

Therefore, Lexington's reading of the Pollution and Contamination Exclusion is reasonable.

/ / /

/ / /

/ / /

---

[3] *See, e.g.*, Compl. ¶ 22 ("According to the World Health Organization, we know that the disease is caused by the SARS-CoV-2 virus, which spreads been people in several different ways. Current evidence suggests that the virus spreads mainly between people who are in close contact with each other, for example at a conversational distance. The virus can spread from an infected person's mouth or nose in small liquid particles when they cough, sneeze, speak, sing, or breathe. Another person can then contract the virus when infectious particles that pass through the air are inhaled at short range (this is often called shortrange aerosol or short-range airborne transmission).").

      ii.   <u>Segerstrom's reading of the Pollution and Contamination Exclusion is also reasonable.</u>

As discussed above, Lexington's position relies on the plain meaning of "virus." But although each term of an insurance policy must be read in its "ordinary and popular sense," it must also be interpreted in context and with regard to its intended function and the structure of the policy as a whole. *See Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co*., 855 P.2d 1263, 1270 (Cal. 1993). And when determining whether a policy provision has a "plain meaning," the Court must consider the entire policy as a whole. Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other."). "Under this principle, courts will adopt a restrictive meaning of a listed item if acceptance of a broader meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." *Blue Shield of Cal. Life & Health Ins. Co. v. Superior Court*, 120 Cal. Rptr. 3d 713, 724 (Ct. App. 2011) (citing *People ex rel. Lungren v. Superior Court*, 926 P.2d 1042, 1050 (Cal. 1996)).

Segerstrom does not contest the plain meaning of the word "virus," but rather contends that the Pollution and Contamination Exclusion is inapplicable to its claim. Segerstrom's argument is two-pronged. First, Segerstrom argues that the plain language of the Exclusion requires a volitional act involving an "**actual**, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote," such as a spill or intentional release of harmful material. Endorsement #010 at 53 (emphasis added). Furthermore, the terms "release, discharge, escape, or dispersal" should be interpreted in the context of traditional environmental pollution. Second, with that context in mind, Segerstrom argues that no such volitional act involving the "release, discharge, escape, or dispersal" of a "virus," as defined in the Exclusion, exists to trigger the exclusion and, therefore, its claim should not be precluded.

Segerstrom's reading of the terms "release, discharge, escape or dispersal," as used in the Exclusion, is guided by the only binding authority cited by the parties that appears to bear on this question directly: *Mackinnon v. Truckers Insurance Exchange*, 73 P.3d 1205 (Cal. 2003). In *MacKinnon*, the California Supreme Court was called upon to apply a similar "pollution" exclusion

1    to the negligent use of a pesticide at a residential property. *Id.* at 1207–08. The Court described the

2    relevant exclusion as follows:

3         Under "Exclusions" the policy states: "We do not cover Bodily Injury or Property

4         Damage (2) Resulting from the actual, alleged, or threatened discharge, dispersal,
          release or escape of pollutants: (a) at or from the insured location." The terms

5         "Pollution or Pollutants" are defined, in the definitions section at the beginning of the
          policy, as "mean[ing] any solid, liquid, gaseous or thermal irritant or contaminant,

6         including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste materials.
          Waste materials include materials which are intended to be or have been recycled,

7         reconditioned or reclaimed."

8
*Id.* at 1207.
9

10        The *MacKinnon* court provided a history of the "pollution exclusion" and an extensive

11   discussion of the two differing approaches to interpreting that exclusion—two approaches which

12   mirror the approaches taken by Segerstrom and Lexington here. *Id.* at 1209–12. The *MacKinnon*

13   court further recognized that the use of the terms "discharge, dispersal, release or escape" reflects the

14   historical purpose of the exclusion—"avoidance of liability for environmental catastrophes related to

15   *intentional* industrial pollution." *Id.* (emphasis added). As a result, the court limited the scope of the

16   pollution exclusion similar to that in the instant case to "injuries arising from events commonly

17   thought of as pollution, i.e. environmental pollution." *Id.* at 1216 (noting that the terms "'discharge,

18   dispersal, release or escape,' . . . used in *conjunction with* 'pollutant,' commonly refer to the sort of

19   conventional environmental pollution at which the pollution exclusion was primarily targeted").

20   Although the court determined that pesticides fell within the definition of pollutants in the exclusion,

21   *id.* at 1218, it ultimately determined that "it is far from clear [the insured's] claim, . . . for injuries

22   arising from the normal, though negligent, residential application of pesticides, would be commonly

23   thought of as pollution," *id.* For that reason, it did not preclude coverage. [4]

24   _____

25   [4] During the hearing on this matter, Lexington argued that *MacKinnon* was distinguishable from the instant
     case because (1) in *MacKinnon*, the court construed the pollution exclusion to encompass "gradual"

26   degradation to the environment, of the sort not caused by viruses, and (2) reading this exclusion as applying
     only to traditional environmental pollution, as defined in *MacKinnon*, would require the Court to read the

27   word "virus" out of the policy. The Court finds this argument unavailing for a number of reasons. First, the
     Court notes that the *MacKinnon* court discussed the concept of gradual degradation in the context of

28

The words used in the exclusion here are largely the same as those used in *MacKinnon*—with the same familiar connotations. *Id.* at 1214–15 (discussing "pollutant," "discharge," "dispersal," "release," and "escape"). And given the substantial similarity of both provisions, it seems there can be little dispute that the Pollution and Contamination Exclusion has the same origin as the pollution exclusion in *MacKinnon*—"to address the enormous potential liability resulting from anti-pollution laws enacted between 1966 and 1980." *Id.* at 1216. As a result, the Court concludes that the terms "discharge, dispersal, release, and escape" should, as in *MacKinnon*, be read as limited to traditional environmental pollution and therefore exclude coughing, breathing, or sneezing.

As a result, Segerstrom contends that in order to trigger the Exclusion, there must be a volitional act involving the "release, discharge, escape, or dispersal" of a "virus" at some point in time. Here, Segerstrom's insurance claim is predicated upon the general COVID-19 outbreak in Orange County which prompted authorities to issue stay-in-place orders, not on any volitional act that would otherwise have triggered the Exclusion.

The holding of *MacKinnon*—that similar language should be interpreted to refer to traditional environmental pollution—therefore supports the view that Segerstrom's reading of the Exclusion is, at the very least, reasonable.

        iii.   <u>Governing California law supports Segerstrom's reading of the Pollution and Contamination Exclusion.</u>

This Court is guided not only by the holding of *MacKinnon*, but—given the similarities between *MacKinnon* and the present action—this Court shall be guided by the interpretive approach taken by the California Supreme Court in *MacKinnon*. Most importantly for this Court's purposes, after reiterating the burden on the insurer to establish exclusion, the California Supreme Court stated,

---

providing a historical overview of pollution exclusions. *MacKinnon*, 73 P.3d at 1210 ("[C]ourts continued to construe the policy to cover damages resulting from long-term, gradual exposure to environmental pollution. . . . By the mid-1980s a significant body of law had developed construing the 'sudden and accidental' exception to embrace gradual pollution."), 1211 ("[T]he absolute pollution exclusion was designed to serve the twin purposes of eliminating coverage for gradual environmental degradation . . . ." (citations omitted)). As a result, the *MacKinnon* court provides this historical context in order to explain one of the primary arguments in support of a narrower interpretation of the pollution exclusion. Moreover, even if the Court were to find this line of argument compelling, as the Court discusses, *supra*, the Exclusion is, at best, ambiguous and therefore must be read in favor of coverage.

"Therefore, in order to ascertain the scope of an exclusion, we must first consider the coverage language of the policy." *Id.* at 1213. Here, the coverage language expressly includes discussion of an outbreak of a communicable disease, which "establishes a reasonable expectation" that Segerstrom will have coverage for such an outbreak. *See id.* (noting that language in a policy purporting to cover "damages caused by bodily injury . . . establishes a reasonable expectation that the insured will have coverage for ordinary acts of negligence resulting in bodily injury").

In interpreting the Exclusion, the Court must "attempt to put itself in the position of a layperson and understand how she or he might reasonably interpret the exclusionary language." *Id.* at 1214. The *MacKinnon* court concluded that "because the insurer's broad interpretation of the pollution exclusion leads to absurd results and ignores the familiar connotations of the words used in the exclusion, we do not believe it is the interpretation the ordinary layperson would adopt." *Id.* at 1216. Similarly, Lexington's broad interpretation would lead to absurd results as outlined in Segerstrom's briefing.

Finally, the California Supreme Court directs this Court to consider the reasonableness of the interpretation of the exclusion in light of the purpose of the policy as a whole. In *MacKinnon*, the insurer's interpretation "would fundamentally undermine that purpose by cutting a broad and arbitrary swath through [Comprehensive General Liability] protections, excluding virtually all injuries involving substances that cause harm." *Id.* at 1217. Similarly, the purpose of the Special Time Element Coverage, like other business interruption insurance, "is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the same position it would have occupied if the interruption had not occurred." *Amerigraphics, Inc. v. Mercury Cas. Co.*, 107 Cal. Rptr. 3d 307, 319 (Ct. App. 2010), *disapproved of by Nickerson v. Stonebridge Life Ins. Co.*, 371 P.3d 242 (Cal. 2016). And in this instance, the Special Time Element portion of the policy expressly states that "contagious or infectious disease" that occurs "at any insured location," as well as "outbreak of a contagious and/or infectious disease" that occurs "within a radius of ten (10) miles of an insured location," are both covered. Lexington's reading would cut a broad swatch through these protections, again excluding virtually all losses involving substances that

1  cause harm and excising the specific communicable disease outbreak coverage Segerstrom
2  bargained for.
3       Lexington noted during the hearing on this matter that the Special Time Element insuring
4  against "outbreak[s] of a contagious and/or infections disease" was merely ancillary. In fact,
5  Lexington contends that their expansion of the industry-standard pollution exclusion to include the
6  term "viruses" was designed to "take out coverage for virus." However, Lexington's argument is
7  unavailing, considering the history of the pollution exclusion and, as Segerstrom points out in its
8  briefing, "had Lexington intended to carve the express coverage granted in the Cancellation
9  Coverage, and bar all coverage for virus-related losses, it could have easily done so with a long-
10 available, industry standard exclusion."[5] Opp'n at 22; *see Marina Pac.*, 296 Cal. Rptr. 3d at 791
11 (finding that insurer's failure to include an "all-encompassing" virus exclusion supports a narrow
12 interpretation of its "mortality and disease" exclusion, which the court construed as inapplicable to
13 loss "resulting from a death caused by a virus or other disease").
14       Regardless of the Exclusion's origins and Lexington's intentions, it is still reasonable to infer
15 that the Exclusion is targeted at and intended to protect against traditional environmental pollutants
16 and the like. As the law makes clear, this Court must view these policy terms in their entirety. The
17 exclusion at issue is entitled "2. Pollution and Contamination Exclusion" and contains four
18 paragraphs. The first paragraph of the exclusion broadly explains that loss or damage caused by
19 contaminants and pollutants is excluded from coverage. The third and longest paragraph contains the
20 true scope of the exclusion. Nestled within this paragraph is the clause upon which Lexington
21 predicates its denial. The paragraph begins with the definition of "CONTAMINANTS" and

23 [5] While the absence of an express exclusion does not necessarily result in coverage, it is significant to note
24 that many first party property insurance policies included specific virus exclusions in the wake of the SARS
   outbreak (caused by the SARS-CoV virus) in the early 2000s. *See Marina Pac. Hotel & Suites, LLC v.
   Fireman's Fund Ins.*, 296 Cal. Rptr. 3d 777, 791 (Ct. App. 2022). As the California Court of Appeal
25 recognized, in 2006, the Insurance Services Office (ISO) introduced a new industry-standard endorsement for
26 commercial property policies, "CP-01-40-07-06—Exclusion of Loss Due to Virus or Bacteria," which stated
   there is no coverage for losses of damage caused by, or resulting from, any virus, bacterium or other
27 microorganism that induces or is capable of including physical distress, illness or disease. *Id.* Lexington's
   argument implies that their expansion of the pollution exclusion was meant to have the same effect as the
28 virus exclusion adopted in 2006. This argument is unavailing, however, considering the history of the
   pollution exclusion.

"POLLUTANTS" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," followed by the virus language. Endorsement #010 at ¶ 2. The paragraph then provides an enumerated list of environmental protection regulations, such as "the Federal Water, Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U.S. Environmental Agency." *Id.*

By nestling the virus language between terms commonly thought of as traditional pollution and various environmental regulations, it is reasonable to conclude that the drafters designedly set limitations on the interpretation of the clause. Furthermore, the paragraph following the Pollution and Contamination Exclusion (on the same page) is entitled "Asbestos, Dioxin or Polychlorinated Biphenyls Exclusions" in bolded letters. This understanding of the Exclusion's limited reach is reinforced by the Policy's Special Time Element, which applies if there is an interference with the business caused by a public authority order that a location be evacuated upon the existence or threat of hazardous conditions or contagious or infectious disease. The drafters of this Endorsement left little room for a reasonable party to understand it to apply to contagious or infectious diseases, like COVID-19, particularly given the explicit inclusion of "contagious or infectious disease" twice in the Special Time Element Coverage. Understandably, the denial of the insurance claim could reasonably feel like a hidden technicality, rather than "conspicuous, plain and clear." *Haynes*, 89 P.3d at 385. If all losses caused by a virus were excluded, even those indirectly resulting from the virus, as Segerstrom contends, the Special Time Element would be meaningless.

Indeed, as the California Court of Appeal noted, "Insurers cannot take in premium for a coverage grant that names a specifically covered risk—here virus contamination—and then justify denying coverage for it under all circumstances because some other risk may be covered under the same coverage grant." *John's Grill, Inc. v. Hartford Fin. Servs. Grp., Inc.*, 86 Cal. App. 5th 1195, 2022 WL 17959561, at *2, 15 (2022) (considering "how to reconcile" a provision providing coverage for "loss or damage caused by virus[es]" as a result of enumerated causes with a provision excluding any "loss or damage caused directly or indirectly by the [p]resence, growth, proliferation, spread or any activity of . . . bacteria or virus").

Because courts are obligated to give effect to every part of an insurance policy, such policies should not be read in such a way as to render some of its terms meaningless. *AIU Ins. Co.*, 799 P.2d at 1276 (citing CAL. CIV. CODE § 1641). Therefore, this Court finds that Segerstrom's reading is reasonable and therefore the Exclusion is, at most, ambiguous.[6] *See Waller*, 900 P.2d at 627.

### iv.   Lexington's contrary authority is unavailing.

Although Lexington cites to numerous cases applying similar exclusions to the COVID-19 outbreak, none involve policy coverage that explicitly includes a communicable disease outbreak as part of business interruption insurance. This distinction is important in light of the admonition in *MacKinnon* that the interpretation of this category of exclusion must begin with an examination of the policy coverage. And none of these cases contend with *MacKinnon*'s holding that even a substance that is enumerated within the definition of a "pollutant" may not reasonably be excluded because of the history and purpose of that exclusion.

For example, the court in *AECOM v. Zurich Am. Ins. Co*., No. 2:21-CV-00237, 2021 WL 6425546 (C.D. Cal. Dec. 1, 2021), applied California law to find the relevant exclusion unambiguous, but it did not address *MacKinnon*'s interpretation of the highly similar Pollution Exclusion. The court in *Zwillo V. Corp. v. Lexington Ins. Co*., 504 F. Supp. 3d 1034 (W.D. Mo. 2020), applied Missouri precedent which, contrary to *MacKinnon*, holds that the language substantially similar to the Pollution and Contamination Exclusion should not be limited to traditional environmental pollution when the specific substance at issue is listed. The court in *PBM*

---

[6] This Court acknowledges that there are arguments against Segerstrom's reading.  At the October 6, 2022, hearing, Lexington argued that the Pollution and Contamination Exclusion cannot be limited to a traditional environmental pollution because doing so would render a portion of the exclusion superfluous. Lexington points to an exception in the exclusion for "loss or damage caused by fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm, hail, vandalism, malicious mischief." As discussed previously, the "whole of contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other." CAL. CIV. CODE § 1641. None of these enumerated exclusions would naturally fall under the category of traditional environmental pollution. Therefore, if the Exclusion was meant to apply strictly to traditional environmental pollution, as Segerstrom insists, this additional enumeration of exceptions would be unnecessary and have no effect.

But because Lexington cannot show that its reading is the only reasonable one, this Court is bound to find the provision ambiguous as a matter of law—Lexington, as the insurer, would have to establish that its interpretation was the only reasonable one to prevail. *Palp*, 132 Cal. Rptr. 3d at 599.

*Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707 (Va. 2012), relied on the fact that there are no traditional environmental words such as "environment," "environmental," or "industrial," in the exclusion substantially similar to the Pollution and Contamination Exclusion. On this basis, it held that the exclusion should therefore not be limited to traditional environmental pollution, and did not contend with *MacKinnon*, where the Pollution Exclusion also did not contain these traditional environmental words). The court in *Circus Circus v. AIG Specialty Ins. Co.*, 525 F. Supp. 3d 1269 (D. Nev. 2021), distinguished Nevada precedent similar to *MacKinnon* on the ground that the exclusion at issue included not just "environmental pollutants," but also "health-harming contaminants." This appears to be a distinction without a difference as the environmental pollutants in *MacKinnon* are commonly understood to be health-harming.

The court in *Endeavor Operating Co. v. HDI Glob. Ins. Co.*, No. 21STCV23693 (Cal. Sup. Ct. Los Angeles Cnty. Apr. 4, 2022) (ECF No. 32, Ex. 1.), discusses *MacKinnon*, but does not appear to contend with the dictates discussed here. The court found that any reasonable reading of the Pollution and Contamination Exclusion would include the SARS-CoV-2 virus because it harms humans, but nearly all, if not all, of the substances in the exclusion in *MacKinnon* also harm humans. *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108 (S.D.N.Y. 2021), was explicitly decided in the absence of any controlling case law similar to *MacKinnon*. The court in *Dana Inc. v. Zurick Am. Ins. Co.*, 2022 WL 2452381 (6th Cir. July 6, 2022), applies Ohio law and distinguishes governing law simply because the Pollution and Contamination Exclusion is not the same as the Pollution Examination, with no persuasive reasoning as to why that distinction would make a difference, given the similarity of the relevant portions of the exclusion, that is, the ones that connote traditional environmental pollution. The court in *APX Operating Co., LLC v. HDI Glob. Ins. Co.*, 2021 WL 5370062 (Del. Sup. Ct. Nov. 18, 2021), *aff'd*, 285 A.3d 840 (Del. Oct. 5, 2022) (tbl.), determined that the Pollution and Contamination Exclusion was not limited to traditional environmental pollution because it was not explicitly limited in that way and based upon the plain meaning of discharge, arguments that were largely considered and rejected in *MacKinnon*. The court in *Ascent Hosp. Mgmt. Co. v. Emps. Ins. Co.*, 537 F. Supp. 3d 1282 (N.D. Ala. May 5, 2021), *aff'd*, 2022 WL 120722 (11th Cir. 2022), refuses to engage in what it calls "mental gymnastics," but what

it considered mental gymnastics is precisely what *MacKinnon* calls upon this Court to do—interpret this Exclusion in context.

This Court is simply not free to disregard the dictates of the California Supreme Court, no matter how compelling it might find these other courts' analyses to be, given that they do not give this Court any reason to believe that *MacKinnon* would not apply with full force to the Pollution Contamination Exclusion.

***

Ambiguities or uncertainties in the policy are to be construed against the insurer in order to achieve the object of coverage for the losses to which the policy relates. *Prickett*, 363 P.2d at 909. This Court finds that the Pollution and Contamination Exclusion is susceptible of two reasonable interpretations and therefore ambiguous. *See Waller*, 900 P.2d at 627. It must, as a result, be construed against Lexington and in favor of coverage; it simply does not preclude Segerstrom's claim at this stage.[7]

### B. Segerstrom's claims for bad faith and declaratory relief survive.

Lexington further contends that, because Segerstrom's breach of contract claim fails, its bad faith and declaratory judgment claims also fail. Mot. at 13. Both of Segerstrom's bad faith and declaratory judgment claims are predicated upon allegations of Lexington's breach of contract. *See* Compl. ¶¶ 49–57 ("Lexington acted in bad faith and in conscious disregard of Segerstrom's rights by, among other things, . . . [f]ailing and refusing to pay for Segerstrom's losses suffered as described above; [a]sserting grounds for disputing coverage that it knows are not supported by, and are contrary to, the terms of the Lexington Policy, AIG's own representations and conduct, the law, insurance industry custom and practice, the parties' course of dealings, and the facts . . . [f]or the purpose of consciously withholding from Segerstrom the rights and benefits to which it is entitled under the Lexington Policy."), 67–69 ("Segerstrom seeks a judicial declaration confirming that

---

[7] Because the Court concludes that the Contamination Exclusion is susceptible of two reasonable interpretations and therefore does not preclude Segerstrom's claim at this stage, the Court need not reach Segerstrom's additional arguments that extrinsic evidence supports coverage for COVID-related business losses.

Lexington's contentions as stated above are wrong and that Segerstrom's contentions as stated above are correct; that Lexington must honor all duties under the Lexington Policy, including its duty to pay for Segerstrom's losses . . . .").

However, as discussed previously, the Court ultimately finds that the Pollution and Contamination Exclusion endorsement does not preclude coverage of Segerstrom's COVID-related losses and that Segerstrom therefore properly stated a breach of contract claim. As a result, the Court declines to dismiss the declaratory and bad faith claims.

**IV.   <u>Conclusion</u>**

In light of the foregoing, the Court hereby DENIES the Motion to Dismiss.

IT IS SO ORDERED.

Dated: February 27, 2023

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge